CHICAGO, M. & ST. P. RY. CO. v. IRVING. *

(Circuit Court of Appeals, Ninth Circuit.  August 7, 1916.)

No. 2664.

1. CARRIERS ⊜316(5)—INJURIES TO PASSENGERS—ACTIONS—PROOF—RES IPSA LOQUITUR.

Where a passenger on a regular passenger train shows that the train was derailed, causing injuries to her, she has, without further proof, offered sufficient evidence of the carrier's duty and of its neglect, a prima facie case being made, under the maxim "res ipsa loquitur," so as to throw on the carrier the burden of proving absence of negligence.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1288; Dec. Dig. ⊜316(5).]

2. CARRIERS ⊜316(5)—INJURIES TO PASSENGERS—ACTIONS—PROOF—RES IPSA LOQUITUR—QUESTIONS FOR JURY.

Where a passenger makes a prima facie case by showing that there was a derailment which caused her injuries, and the carrier produces circumstantial evidence tending to show that the derailment was not due to its negligence in track inspection but to vandalism, the question of negligence is wholly for the jury, and is properly submitted by an instruction, requiring plaintiff to show negligence by a preponderance of the evidence.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1288; Dec. Dig. ⊜316(5).]

3. CARRIERS ⊜320(12)—INJURIES TO PASSENGERS—NEGLIGENCE—EVIDENCE—SUFFICIENCY.

The jury need not accept as a fact that inspection of four tracks nearly two miles long in a period of two hours by one workman, and inspection by roadmaster from rear of fast-moving train, is sufficient to have discovered a defect such as caused the accident in which plaintiff passenger was injured.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1179, 1190; Dec. Dig. ⊜320(12).]

In Error to the District Court of the United States for the Northern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Action by Sarah J. Irving against the Chicago, Milwaukee & St. Paul Railway Company.  On writ of error to review judgment for plaintiff.  Affirmed.

George W. Korte, of Seattle, Wash., and Cullen, Lee & Matthews, of Spokane, Wash., for plaintiff in error.

Danson, Williams & Danson, of Spokane, Wash., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge.  Sarah J. Irving, defendant in error here (we will call her plaintiff), brought action for damages for injuries against the Chicago, Milwaukee & St. Paul Railway Company, plaintiff in error here (called defendant).  She was a passenger upon a regular train operated by the appellant company between Chicago and Seattle, and as the train was leaving Chicago, and while running between Western avenue and Pacific junction in that city, the engine

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied October 9, 1916.

and part of the train were derailed. The railroad company pleaded, in substance, that it was not responsible for the derailment of its train, but that it was caused by the removal of spikes and angle bars and the displacement of the rail at the point of derailment, and was the work of trespassers or others unknown to it who designed to wreck the train.

Reducing what the testimony tended to show to the briefest possible form, the substance of it may be stated as follows:

Plaintiff said that she left Chicago at 10:15 in the night of March 21, 1914; that in 15 or 20 minutes, as they were leaving the city of Chicago, and while she was washing in a toilet room of the tourist car, the train was suddenly thrown backwards and forwards, and she was hurt; that when it stopped, she followed other passengers who left the train, and that she saw the engine lying over on the side of the track; that her train was on the outside track, and that she noticed a rail standing up off the ground and turned around; that part of the track was torn out behind the engine, and the front end of the car in which she was was off the rails.

For the defendant the section foreman testified that at the point where the train was derailed there were four tracks; that his duty was to keep the four about the place of the wreck in repair, tighten the bolts, keep rails straight, and do work like that; that he had three men working under him; that he inspected the four tracks every morning; that he walked and observed the tracks the morning of the accident to see if spikes were out or any bolts broken, and found everything on track 1, where the derailment occurred, in good condition; that the rails were bolted together with angle bars 24 inches long, with nuts and spikes all in place, and that there was bond wire for the signals; that he arrived at the wreck about an hour and a half after it occurred; that at the place of the accident the tracks have a curve, with some elevation to one rail; that the track, which is elevated some 14 feet, is fenced on both sides in that vicinity, but that by climbing up there was a way to get from the street to the track elevation; that in his inspection, which occupied from an hour and a half to two hours, he did not look at every rail end, but that he walked in the middle of the track and looked at every joint, and could tell if a spike was out or anything wrong; and that after the accident he found the engine lying across the tracks, headed west, and next to the engine the baggage car, down the bank.

The trainmaster of the railroad company said he first saw the situation about an hour after the derailment; that he observed that one rail had been disjointed from another, and that both angle bars were missing, the outside spikes on the south rail for some distance back were missing, and that the receiving rail was out of line about 2 inches, the end of it showing deep marks where it had been struck by the flanges of the forward wheels of the engine; that he found among the weeds 3 or 4 feet away from the joint some angle bars, bolts, and spikes, and that the next morning he found a clawbar and a track wrench concealed on the abutment of the viaduct over a nearby street about a block away; that he found the articles described as having

been found in the weeds on the east side of the east rail of track No. 1, almost directly opposite the point of the derailment, or where the rails were disjointed; that the bolts he found did not show any evidence of having been broken off.

The superintendent of terminals for the railroad company, who arrived at the wreck 30 or 35 minutes after it occurred, says that he found the engine crossways of the four main tracks and the two day coaches and the forward truck of the tourist car off the track, the balance of the train being still on the rails; that he found where the joints had been opened and an angle bar placed between those, or in the opening; and that the company had no track walkers at night.

The assistant superintendent of terminals for the company said that he arrived 40 minutes after the wreck, and noticed that the angle bars from the receiving rail were gone and the spikes were out of the ties on the inside of the receiving rail for six or eight ties; that the receiving rail was moved over so that the flange of the engine wheel had struck close to the outer edge of the ball of the rail, and that a large number of trains, which witness described in detail, had gone safely over the track during the five hours preceding the time that the train in question was derailed; and that the bonding wires were not broken except where the rails were bent up after the accident.

The roadmaster for the defendant company said that he arrived after the wreck; that the curve where the accident happened was a slight one, a one-degree curve; that from the hind end of a caboose he had observed the track the evening of the derailment; and that it was in good condition. This witness explained to the jury how the track was laid and spiked and how the bonding wire was attached to the receiving rail. Witness explained that the train ran on a track above the street, the track being erected on concrete abutments about 14 feet above the street, and that the bottom of the bridge is iron plate, with a girder for the rails, with steel girders between each track and on the outside of each track. He explained angle bars and their function, and said that he observed that five spikes had been removed on the inner rail, on the inner side of the receiving rail; that spikes were lying about there; that from marks on the tie he thought that a bar had been used to get around the spike near the joint, and that from the position in which the rails were he thought the flange of the engine wheel had struck the receiving rail about 1¾ inches from one of the sides; that when the wheel hit, the engine jumped up and got outside and crossed the rail and bent it; that the outer rail, where the rail was found open, was all right; that he found another place where bolts had been taken out from the rail joint farther south on the same track, 1,000 feet east of where the accident occurred; that there was no defect previously existing in the track or ties at the point of derailment, and nothing to indicate that there was any defect which might have caused the wreck, other than the opening of the rails; that the bond wires were not broken, and if they had been, the signal system would have been put at danger; that the night was raw, with a little snow falling; that there are lights in the subway under the tracks.

A special agent of the defendant company said that he observed nothing wrong with the track when he went along it in the evening at about 6 or 6:15 o'clock; that he was the first man at the scene of the wreck after it occurred; that he observed one rail was shoved in and a piece of the angle bar was lying on the side of the outer rail on No. 1 track, the east rail; that upon the receiving rail there were some spikes "pulled" and the bolts taken out, and that he found bolts and spikes and angle bars at the foot of the embankment, and that the spikes and one of the angle bars found there were not broken; that he found these things about 30 feet away in the weeds; that the nuts were off the bolts; that the next morning he found a small track wrench and crowbar about 200 feet on the prairie opposite the point away from the foot of the embankment.

The engineer of the wrecked train said that he reached the point where the train was derailed about 10:30 o'clock; that he had observed nothing before the occurrence; that he was running about 35 miles an hour; that the first thing he knew he was on the ground, as though he had been right off the end of the rail; and that he did not look at the track ahead of him as he went along.

At the close of all of the evidence in the case, the defendant moved for a directed verdict for the reason that the evidence was insufficient to support any verdict, and that there was no evidence of negligence on the part of the railroad company. The court overruled the motion, and instructed the jury in part as follows:

"Taking into consideration all of the testimony introduced before you, and presumptions of fact to which I have referred, if you can say that you are satisfied from a preponderance of the testimony here that the defendant company was negligent, plaintiff is entitled to recover; but, if the jury is not satisfied of the fact by the preponderance of the testimony, your verdict must be for the defendant."

The jury found for the plaintiff. Judgment was entered, and the railroad company sued out writ of error.

[1] Appellant concedes that the case was one for the application of the doctrine of res ipsa loquitur, but contends that the plaintiff below, although she had the legal right to compel the defendant to assume the burden of explaining the cause of the accident, could not rely for a recovery upon what appellant calls the "bare presumption" which it says arises from the mere fact of the accident which resulted in her injury; and, furthermore, it contends that, inasmuch as the defendant established that the derailment was caused by "vandalism," and not by any agency under the control of the defendant, there being no evidence offered tending to disprove any item of appellant's evidence as to the physical facts found to exist immediately after the derailment of the train, the facts as established by the defendant must stand as admitted, and no conclusion was reasonably possible other than the one contended for by the appellant.

The position taken by the plaintiff is that the derailment of the train was in itself such evidence of negligence that it gave rise to a conflict of evidence when controverted, and that it became a matter for the jury to determine whether or not the evidence of the railroad company counterbalanced that offered by the plaintiff.

The concession made by appellant carries with it the recognition that, this being a case between a passenger and a carrier, the contract being to carry safely, proof of the derailment and injury made a prima facie case which the carrier had to meet and overcome. Nitroglycerine Case, 82 U. S. (15 Wall.) 524, 21 L. Ed. 206.

Res ipsa loquitur was tersely defined by Judge Holmes for the Supreme Court of Massachusetts in Graham v. Badger et al., 164 Mass. 42, 41 N. E. 61. He said:

"Res ipsa loquitur, which is merely a short way of saying that, so far as the court can see, the jury from their experience as men of the world, may be warranted in thinking that an accident of this particular kind commonly does not happen except in consequence of negligence, and that therefore there is a presumption of fact, in the absence of explanation or other evidence which the jury believe, that it happened in consequence of negligence in this case. Presumptions of fact, or those general propositions of experience which form the major premises of particular conclusions of this sort, usually are for the jury. The court ordinarily confines itself to considering whether it can say that there is no such presumption, or, in other words, that such accidents commonly are not due to negligence."

Stokes v. Saltonstall, 13 Pet. 181, 10 L. Ed. 115, seems to have been the earliest case in which the doctrine of res ipsa loquitur was considered by the Supreme Court. That was an action against the proprietor of a stagecoach. The trial court instructed that the plaintiff, having been a passenger on the stagecoach, the facts that the carriage was upset and plaintiff injured were prima facie evidence that there was carelessness or negligence or want of skill, and threw upon the defendant the burden of proving that the accident was not occasioned by the driver's fault. The court held that the law was correctly stated.

Stokes v. Saltonstall, supra, was approvingly cited in Railroad Company v. Pollard, 89 U. S. (22 Wall.) 341, 22 L. Ed. 877. The facts there were that a woman was traveling in a Pullman car, and by the bumping of one car against another she was thrown against the arm of the seat in which she had been sitting and injured. The charge to the jury, which was affirmed by the Supreme Court, was to the effect that, while the plaintiff was bound to satisfy the jury that the injury was caused by the negligence of the railroad company, and that she was exercising reasonable care—

"this would be prima facie or presumptive evidence of the defendants' liability, and that the plaintiff would not be required to show by what particular acts of misconduct or negligence on the part of the defendants the injury was occasioned."

But the court also told the jury to be careful not to consider any presumption against the defendant until they were satisfied by affirmative proof on the part of the plaintiff that she was in the exercise of reasonable care and action when the injury was sustained. This charge was regarded as authorized by the decision in Stokes v. Saltonstall, supra.

In Gleeson v. Virginia Midland Railroad Company, 140 U. S. 435, 11 Sup. Ct. 859, 35 L. Ed. 458, where a railway postal clerk making the run from Washington to Danville, Va., was injured by a derailment of the train by a landslide, the trial court charged the jury that

the burden of proof was on the plaintiff to show that the defendant was negligent, and that its negligence caused the injury. The plaintiff's counsel objected, and asked the court to modify the instruction by adding that the injury to the plaintiff upon the car, if the plaintiff was in the exercise of ordinary care, was "prima facie evidence" of the company's liability. The court refused to make the modification, and a verdict was rendered for the defendant company. Judgment on the verdict was affirmed, and the case was then taken to the Supreme Court. The Supreme Court cited the case of Kearney v. London, etc., Railway, L. R. 6 Q. B. 759, and Stokes v. Saltonstall, supra, and Railroad Company v. Pollard, supra, for holding that the happening of an injurious accident in passenger cases is prima facie evidence of negligence on the part of the carrier, and that, the passenger being himself in the exercise of due care, the burden then rests upon the carrier to show that its whole duty was performed, and that the injury was unavoidable by human foresight. The conclusion of the court was that the trial court erred in refusing to modify the instructions as requested by the plaintiff.

"The law is," said the court, "that the plaintiff must show negligence in the defendant. This is done prima facie by showing, if the plaintiff be a passenger, that the accident occurred. If that accident was in fact the result of causes beyond the defendant's responsibility, or of the act of God, it is still none the less true that the plaintiff has made out his prima facie case. When he proves the occurrence of the accident, the defendant must answer that case from all the circumstances of exculpation, whether disclosed by the one party or the other. They are its matter of defense. And it is for the jury to say, in the light of all the testimony, and under the instructions of the court, whether the relation of cause and effect did exist, as claimed by the defense, between the accident and the alleged exonerating circumstances. But when the court refuses to so frame the instructions as to present the rule in respect to the prima facie case, and so refuses on either of the grounds by which the refusal is sought to be supported herein, it leaves the jury without instructions to which they are entitled to aid them in determining what were the facts and causes of the accident, and how far those facts were or were not within the control of the defendant."

In San Juan Light Company v. Requena, 224 U. S. 89, 32 Sup. Ct. 399, 56 L. Ed. 680, the court, in sustaining a charge upon negligence, defined the doctrine of res ipsa loquitur in this way:

" * * * When a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care."

In Sweeney v. Erving, 228 U. S. 233, 33 Sup. Ct. 416, 57 L. Ed. 815, Ann. Cas. 1914D, 905, the court held that the rule of res ipsa loquitur does not have the effect of shifting the burden of proof, but that there is a class of cases where the circumstances of the occurrence that has caused the injury are of a character to give ground for a reasonable inference that if due care had been employed by the party charged with care in the premises, the thing that happened amiss would not have happened. The court said that the doctrine seems to

have been erroneously confused with the question of burden of proof, and expressed its opinion as follows:

"Res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. Res ipsa loquitur, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff."

This view is regarded as that generally taken in well-considered judicial opinions, a large number of which are referred to by Justice Pitney for the court.

From these discussions and decisions it can be said that where a passenger on a regular passenger train shows that the train has been derailed, and that because of being thrown against the side of the car when the derailment occurred she was injured, she has, without further proof, offered sufficient evidence of the carrier's duty and of its neglect to perform its duty. It is not the injury to her, but the circumstances connected with the injury, which warrant the application of the maxim and the inference of negligence. So a prima facie case is made, and whether we say that it is based upon the presumption or inference of negligence arising from the facts, it is none the less evidentiary, and calls upon the carrier to meet the facts and inferences by showing that it was not guilty of negligence. In Griffen v. Manice, 166 N. Y. 188, 59 N. E. 925, 52 L. R. A. 922, 82 Am. St. Rep. 630, the Court of Appeals of New York, referring to res ipsa loquitur, said:

"If a passenger in a car is injured by striking the seat in front of him, that, of itself, authorizes no inference of negligence. If it be shown, however, that he was precipitated against the seat by reason of the train coming in collision with another train, or in consequence of the car being derailed, the presumption of negligence arises. The res, therefore, includes the attending circumstances, and, so defined, the application of the rule presents principally the question of the sufficiency of circumstantial evidence to establish, or to justify the jury in inferring, the existence of the traversable or principal fact in issue, the defendant's negligence. The maxim is also in part based on the consideration that, where the management and control of the thing which has produced the injury is exclusively vested in the defendant, it is within his power to produce evidence of the actual cause that produced the accident, which the plaintiff is unable to present. Neither of these rules—that a fact may be proved by circumstantial evidence as well as by direct, and that where the defendant has knowledge of a fact but slight evidence is requisite to shift on him the burden of explanation—is confined to any particular class of cases, but they are general rules of evidence applicable wherever issues of fact are to be determined, either in civil or criminal actions." Nebraska Bridge Supply & Lumber Company v. Jeffery, 169 Fed. 609, 95 C. C. A. 137.

[2, 3] The defendant carrier offered its evidence. Whether it met or made a stronger case than plaintiff made was for the jury to say under proper instructions by the court. The whole charge of the court is not in the record, but in that portion which is included, and which we have quoted in the statement of the case, the court pro-

ceeded upon the theory that the plaintiff, in order to recover, had to sustain the allegations of negligence by a preponderance of the evidence, and that unless she succeeded, she could not recover. The defense relied upon evidence largely circumstantial, tending to show that some person unknown to it had deliberately pulled some spikes, removed angle bars, and displaced a rail. This may have been a correct way of accounting for the derailment, but the reasonableness of such a conclusion was evidently not clear to the jury and to the District Judge and, as we read the testimony, is by no means a satisfactory explanation to us. The testimony of the method and times of inspection showed that the duty of the inspector was to inspect four tracks, each one being between 1½ and 2 miles in length, and that he devoted two hours daily to the work. The jury were not obliged to accept it as a fact that in such an inspection the one making it could and would detect the joints and bolts on the rails of the several tracks; nor were they obliged to believe that the roadmaster's inspection made on a fast-moving car was a sufficiently vigilant method to have discovered such a defect as the jury found must have existed. The whole question of whether there was negligence became one for determination by the jury. Sonnentheil v. Christian Moerlein Brewing Co., 172 U. S. 401, 19 Sup. Ct. 233, 43 L. Ed. 492. They saw the principal witnesses and heard them give their testimony; and it was for the jury to say whether the defendant rebutted the prima facie case of the plaintiff. Volkmar v. Manhattan Railway Co., 134 N. Y. 418, 31 N. E. 870, 30 Am. St. Rep. 678; Turner v. Southern Power Co. et al., 154 N. C. 131, 69 S. E. 767, 32 L. R. A. (N. S.) 848; Brown v. Louisiana & M. Railroad Company, 256 Mo. 522, 165 S. W. 1060; Midland Valley Railroad Company v. Hilliard (Okl.) 148 Pac. 1001; Spear v. Philadelphia, W. & B. Railroad Company et al., 119 Pa. 61, 12 Atl. 824; Chaperon v. Portland General Electric Company, 41 Or. 39, 67 Pac. 928; Snediker et al. v. Everingham, 27 N. J. Law, 143; Newark Electric Light & Power Company v. Ruddy, 62 N. J. Law, 505, 41 Atl. 712, 57 L. R. A. 624; New York, C. & St. L. Railroad Company v. Blumenthal, 160 Ill. 40, 43 N. E. 809; Trenton Passenger Railway Company, Consolidated, v. Cooper, 60 N. J. Law, 219, 37 Atl. 730, 38 L. R. A. 637, 64 Am. St. Rep. 592; Boyd v. Portland Electric Company, 41 Or. 336, 68 Pac. 810; Cincinnati, N. O. & T. P. Railway Company v. South Fork Coal Company, 139 Fed. 528, 71 C. C. A. 316, 1 L. R. A. (N. S.) 533; Carroll v. Boston Elevated Railway Company, 200 Mass. 527, 86 N. E. 793; Waller v. Ross, 100 Minn. 7, 110 N. W. 252, 12 L. R. A. (N. S.) 721, 117 Am. St. Rep. 661, 10 Ann. Cas. 715; Cooley on Torts (Vol. 2, 3d Ed.), p. 1424; Shearman & Redfield on Negligence, §§ 58a and 58b (6th Ed.); Wigmore on Evidence, § 2509 (1905 Ed.); Texas & Pacific Railway Company v. Mosley (Tex. Civ. App.) 124 S. W. 485; Thompson on Negligence (vol. 8, White's Supplement, 1914 Ed.), §§ 2774, 7635.

The judgment is affirmed.